Mr. Justice McLEAU
dissenting.
This case is before us on a writ of! error from the Circuit Court for the district of Missouri.
An action of trespass was brought, which charges the defendant with an assault and- imprisonment of the plaintiff, and also of Harriet Scott, his wife, Eliza and Lizzie, his two children, on the ground that they were his slaves, which was without right on his part, and against law.
The defendant filed a plea in abatement, “that said causes of action, and each and every of them, if any such accrued to the said Dred Scott, accrued out of the jurisdiction of this court, and exclusively within the jurisdiction of the courts of the State of Missouri, for that to wit, said plaintiff, Dred Scott, is not a citizen of the State of Missouri, as alleged in his declaration, because he is a negro of African descent, his ancestors were of pure African blood, and were brought into this country and sold as negro slaves; and this the said Sandford is ready to'verify; wherefore, he prays judgment whether the court can or will take further cognizance of the action aforesaid.” '
To this a demurrer was filed, which, on argument, was sustained by the court, the plea , in abatement being held insufficient; the defendant was ruled to plead over. Under this rule he pleaded: 1. Hot guilty; 2. That Dred Scott was a negro-slave, the property ofthe defendant; and 3. That Harriet, the wife, and Eliza and Lizzie, the .daughters of the plaintiff, were the lawful slaves of the defendant.
Issue was joined on the first plea, and replications of dé inju-: m-were filed to the other pleas. _
The partiés agreed to the following facts: In the year-1834; the plaintiff was 'a negro slave belonging to Dr. Emerson, who was a surgeon in the army of the United States. In'that year; Dr. Emerson took the plaintiff from the State of Missouri to *530 the post of Rock Island, in the State of Illinois, and held him there as a slave until the month of April or May, 1836. At the time last mentioned, Ur. Emerson removed the plaintiff from Rock Island to the military post at Port Snelling, situate on the west bank' of the' Mississippi river,' in the territory knowir as Upper Louisiana, acquired by the United States of France, and situate north "of latitude thirty-six degrees thirty minutes north, and north of the State of Missouri. Dr. Emerson held the plaintiff in slavery, at Fort Snelling, from the last-mentioned date until the year 1838.
In the year 1835, Harriet, who is named in the second count of the plaintiff’s declaration, was the negro slave of Major Taliaferro, who belonged to the army of the United States. In that year, Major Taliaferro took Harriet to Fort. Snelling, a military post situated as hereinbefore stated, and kept her there as a slave until the year 1836, and then sold and delivered her as a slave, at Fort Snelling, unto Dr. Emerson, who held her in slavery, at that place,'until the year 1838.
In the year 1836, the plaintiff and Harriet were married at Fort Snelling, with the consent of Dr. Eriierson, who claimed to be their master and owner. Eliza aud Lizzie, named in the third count of the plaintiff’s declaration, are the-fruit of that marriage. Eliza is about fourteen years old, and was born on ■board the steamboat G-ipsey, north of the north line of the 'State of Missouri, and upon the river Mississippi. Lizzie is about seven years old, and was born in the State of Missouri, -.at the military post called Jefferson Barracks.
In the year 1838, Dr. Emerson removed the plaintiff and •said .Harriet and their daughter1 Eliza from Fort Snelling to the State of Missouri, where they have ever since resided.
Before the commencement of the suit, Dr. Emerson sold and. conveyed the plaintiff’ Harriet, Eliza, and Lizzie, to the defendant, as slaves,- and he has ever since claimed to hold-them as slaves.
At the times mentioned in the plaintiff’s declaration, the defendant, claiming to be the'owner, laid his hands upon said plaintiff’. Harriet, Eliza, and Lizzie, and imprisoned them;doing in this respect, however, no more than he might lawfully ■do, if they 'were of right his slaves at such times.
In the first place, the plea to the jurisdiction is not .before us,' on this writ of error. A demurrer to the plea was sustained, which ruled' the plea bad, and the defendant, on leave, pleaded over.
The decision on the demurrer was in favor of. the plaintiff; and as the plaintiff prosecutes'this writ of error, he does .not complain of the decision on the demurrer. The defendant *531 might have complained of this decision, as- against him, and have prosecuted a writ of error, to reverse it. • But as the case, under the instruction of the court to the jury, was decided in his-favor, of course he had no ground of complaint.
But it is said, if the court, on looking at the record, shall cléarly perceive that the Circuit Court had no jurisdiction, it is a ground for the dismissal of the case. This may he characterized as rather a sharp practice, and one which seldom, if ever, occurs. Ko case was cited in the-argument as authoriiy, and not a single case precisely in point is recollected in. our reports* The pleadings' do not show a want of jurisdiction... This want of jurisdiction can only he ascertained by a judgment on the demurrer to the special plea. No such case, it is believed, can he cited. But if this rule of , practice is to he applied in this case, and' the plaintiff in error is required to answer and maintain as well the points ruled in his favor, as toj.sh.QW th_e error, of those ruled against him, he has’ more than an.ordip.ary duly to perform. Under such circumstances, the w%nt of jurisdiction in the Circuit Court must be so clear as not to admit of doubt. Now, the. plea which raises the question,.pf jurisdiction, in my judgment, is radically defective. The gravamen pf the plea is this: “Thai the plaintiff is a negro of African deseént, his ancestors being of pure African blood, and were brought into this country, and sold as negro slaves.”.
There is no averment m this plea which shows, or conduces to show an inability in the plaintiff to sue in the Circuit Court. It does not allege that the plaintiff had his domicil in any other State, nor that he is nbt a free man in Missouri. í£é [g averred to have had a negro ancestry, but this does npt ^hpw.that he is not a citizen of Missouri, within the meaning of'.the act of Congress authorizing him to sue in the Circuit Court. It has never been held necessary, to constitute a .citizen within the act, that he should have the qualifications of an éléctor. 'Females and minors may sue in the Federal, courts, and sb may any individual who has a permanent .domicil in the State under whose laws his rights are protected,, and to which he owes, allegiance.
Being born under our Constitution and .laws, no. naturalizar tion is required, as one of foreign birth,, to make him a citizen. The most general and appropriate definition of the term, citizen is “ a freeman.” Being a freeman, anp, having his domicil in á State different from that of the defendant, he is a. citizen within the act of. Congress, and the courts of the Union' are open to him.
It has often been held,- that the. jurisdiction, as regards parties, can only be exercised between citizens of different States, *532 and that a mere residence is not sufficient; hut this has been said to distinguish a temporary from a permanent residence.
To constitute a good plea to the jurisdiction, it must negative those qualities and rights which enable an individual to sue in the Eederal courts. This has not been done; and on this ground the plea was defective, and the demurrer was properly sustained. Eo implication can aid a plea in abatement or in bar; it must be complete in itself; the facts stated, if true, must abate or bar the right of the plaintiff to sue. -This is not the character of the above plea.' The facts stated, if admitted, are not inconsistent with other facts, which may be presumed, and which bring the plaintiff within the act of Congress.
The pleader has not the boldness to allege that the plaintiff is a slave, as that would assume against him the matter in controversy, and embrace the entire merits of the case in a plea to the jurisdiction. But beyond the facts set out in the plea, the court, to sustain it, must assume the .plaintiff to be a slave, which is decisive on the merits. This is a short and an effectual mode of deciding the cause; but I am yet to learn that:it is sanctioned by any. known rule of pleading.
The defendant’s counsel complain, that if the court take jurisdiction on the ground that the plaintiff is free, the assumption is against the right of the master. This argument is easily answered. In the first place, the plea does not show him to be a slave-; it' does not follow that a man is not free whose ancestors were slaves. The reports of the Supreme Court of Missouri show that this assumption has many exceptions ; and there is no averment in the plea that the plaintiff is not within them.
By all the rules of pleading, this is a fatal defect in the plea. If there be doubt, what‘rule of construction has been established in the slave States? In Jacob v. Sharp, (Meigs’s Rep., Tennessee, 114,) the court held, when there was doubt as to the construction of a will Which emancipated a slave, “it‘must be construed to be subordinate to the higher and more important right of freedom.”
Eo injustice can .result to the master, from an exercise of jurisdiction in this cause. . Such a decision does not in any degree affect the merits of the case; it only enables.the plaintiff to ■ assert his claims tó freedom befóré this tribunal. If the jurisdiction be ruled against him, on the ground that he is a slave,' if is decisive of his fate.
It has been argued that, if a.coloréd person be made a citizen gt aStaterhe cannot sue in the Eederal court. - The Constitution'declares' that Eederal jurisdiction “may be exercised between citizens of different States,” and the same is providéd *533 in the act of 1789. ■ The above argument is properly met by saying that the Constitution was intended to he a practical instrument; and where its language is too plain to he misunderstood, the argument ends.”
In Chiræ v. Chiræ, (2 Wheat., 261; 4 Curtis, 99,) this court says: “ That the power of naturalization is exclusively in Congress does not seem to he, and certainly ought not to he, controverted.” Ho person can legally he made a citizen of a State, andconsequently a citizen of the United States, of foreign birth; unless he he naturalized under the acts of Congress.' Congress has power “to establish a uniform rule of naturalization.”
' It is a power which belongs exclusively to Congress, as intimately connected with our Federal relations. A State may authorize' foreigners to hold' real estate within its jurisdiction, hut it has no power to naturalize foreigners, and give them the rights of citizens. Such a right is opposed to the acts of Congress on the subject of naturalization, and subversive of the Federal powers. I regret that any countenance should he given from this bench to á práctice like this in some of the tates, which has no warrant, in the Constitution.
In the argument, it was said that a colored citizén would not he an agreeable member of society. This is more a matter of taste than of law. Several of the.States have admitted persons of color to the right of suffrage, and in this view have recog-nised them as citizens; and this has been done in the slave as well as the free States; On the question of citizenship, it must be admitted that we have not been very fastidious. Under the late treaty with Mexico, we have- made citizens of all grades, combinations, and colors. The samé was done in the admission of Louisiana and Florida. Ho one ever doubted, and no court ever held, that the people of these'Territories did not become citizens under the treaty. They have exercised all the rights of citizens, without being naturalized under the acts Of Congress. -
There are several important principles involved in this case, which have been argued,'and which máy be considered under the following heads:
1.The locality of slavery, as settled by .this court and the courts of the States. , - .
2.The relation which the Federal Government béars to slavery in the StateB.
3.The power of Congress to establish Territorial Governments, and to prohibit the introduction Of slavery therein.
4.The effect of taking slaves into a new State-or Territory, and so holding them, where slavery is prohibited. ‘
5.“Whether the return of a slave-under the control of his *534 master, after being entitled to Ms freedom, reduces Mm to Ms former1 conditioni
6. Are the decisions of the Supreme Court of Missouri, on the questions before us, binding on this court, -within the rule adopted.
In the course of my judicial duties, I have had occasion to consider and decide several of the above points.
.1. As to thé locality of slavery. The civil law throughout the Continent of Europe, it is believed, without an- exception, is, that slavery can exist only within the territory where it is established; and that, if a slave escapes, or is carried beyond such territory, his master cannot .reclaim him, .unless by virtue of some express stipulation. (Grotius, lib. 2, chap. 15, 5, 1; lib. 10, chap. 10, 2, 1; Wicqueposts Ambassador, lib. 1, p. 418; 4 Martin, 385; Case of the Creole in the House of Lords, 18421 Phillimore on International Law, 316, 335.)
There is no nation in'Eusrope which considers itself bound to return to. his master a fugitive slave, under the civil law or the law of nations., On/the contrary,- the slave is held to be free where there is. no treaty obligation, or compact in some other form, to return him to. his master. The Roman law did not allow freedom to be sold. An ambassador or any other public functionary could not take a slave to France, Spain, or any other country of Europe,- without emancipating him. .. A number of slaves escaped from a Florida plantation, and were' received on board of ship by Admiral Cochrane; by the King’s Bench, they were held to.be free. (2 Barn. and Cres., 440.)
..In the great.and leading case of Prigg v. The State of Pennsylvania, (16 Peters, 594; 14 Curtis, 421,) this court say that, by the general law of nations, no nation is bound to recognise the state.of slavery, as found.within its territorial dominions, where it is in opposition to its own policy and institutions, in favor of the subjects of other nations where slavery is organized. If it does it, it is as a matter of comity, and not ash matter of international right. The state of slavery is deemed to be a mere municipal regulation, founded upon and limited to the range of the territorial laws. This was fully recognised .in- Sdmersett’s case, (Lafft’s Rep., 1; 20 Howell’s State Trials, 79,) which was decided before the American Revolution.
There was some contrariety of opinion among the judges,, on certain points ruled in Prigg’s case, but there, was none in regard to ,the greát principle, that .slavery , is limited to the range of the laws under which.it is sanctioned. ..
No case in England, appears tp have been more thoroughly examined than that of Somersett. The judgment pronounced *535 by Lord Mansfield was the judgment of the Court of King's Bench. The cause was argued at great length, and with great ability, by Hargrave and others, who stood among the most eminent counsel in England. It was held under advisement from term to term, and a due sense of its importance was felt and expressed by the Bench.
In giving the opinion of the court, Lord Mansfield said:
“ The state of slavery is of such 'a nature that it is incapable of being introduced on any reasons, moral or political, but only, by positive law, which preserves its force long after the reasons, occasion, and time itself, from whence it was created, is erased from the memory; it is of a nature that nothing can be suffered to support it but positive law.”
He referred to the contrary opinion of Lord Hardwicke, in October, 1749, as Chancellor': “That he ánd Lord Talbot, when Attorney and Solicitor General, were of opinion that no such claim, ás here presented, for freedom, was valid.”
The weight of' this decision is sought to be impaired, from the terms in which it was described by the exuberant imagination of Curran. The words of Lord Mansfield, in giving the opinion of the court, were such as were fit to be used by a great judge, in a most important case. It is a sufficient answer to. all objections to that judgment, that it was pronounced before the Revolution, and that it was considered by this court as the highest authority. For near a century, the decision in Somersett’s case has remained the law of England. The case of the slave Grace, decided by Lord Stowell in 1827, does not, as has been supposed, overrule the judgment of Lord Mansfield. Lord Stowell held that, during the residence of the slave in England,-“Ho dominion, authority, or coercion, can be exercised over him.” Under another head, I shall have occasion to examine the opinion in the ease of Grace.
To the position, that slavery can only exist except under the authority of law, it is objected, that in few if in any instances has it been established by statutory enactment. This is no answer to the doctrine laid» down by the court. Almost all the principles of the common law had their foundation in usage. Slavery- was introduced into the colonies of this country by Great Britain at an early period of their history, and it was protected and cherished, until it became incorporated into'the colonial policy. It is immaterial whether a system of. slavery was introduced by express law, or otherwise, if it have the authority of law. There is no slave State where the institution is not recognised and protected by statutory enactments and judicial decisions. Slaves are made property by the laws of the slave States, and as such are liable to the claims of cred *536 itors; they descend to heirs, are taxed, and in the South they are a subject of commerce.
In .the case of Rankin v. Lydia, (2 A. K. Marshall’s Rep.,) Judg'e Mills, speaking for the Court of Appeals of Kentucky, says: “In deciding the question, (of slavery,) we disclaim the influence of the general principles qf liberty, which we all admire, and conceive it ought to be decided by the law-as it is, and not as it ought 'to be. ■ Slavery is sanctioned by the laws óf this.State, ana the right to-hold slaves under our municipal regulations is unquestionable. But we view this as a right, masting by positive law of a municipal character, without foundation in the law of nature, or the unwritten and common law.”. , .
I will now consider the relation which the Eederal Government bears to slavery in the States: ■
Slavery is emphatically a State institution. In the ninth section of the first article of the Constitution, it is provided “that the migration or importation of such persons as any of the States now existing shall' think proper to admit, shall not be prohibited by the' Congress prior to the y'ear 1808, but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person.”
Iii the Convention, it was proposed by a committee of eleven to limit the importation of slaves to the year 1800, when Mr. Pinckney moved to extend the time, to the year 1808. This motion wás carried — New Hampshire, Massachusetts, Connecticut Maryland? North Carolina, South Carolina, and Georgia, voting in the affinnative; and New Jersey, Pennsylvania, and Virginia, in the' negative. In -opposition. to the motion, Mr. Madison said: “Twenty years will produce all the mischief that qan.be apprehended from the liberty to import slaves; so long a term will be more dishonorable to the American character than to say nothing about it in the Constitution.” (Madison Papers.)
The provision in regard to the slave trade sho\ys clearly that Congress - considered slavery a State institution, to be continued and regulated by its individual sovereignty; and to conciliate that interest, the slave trade was continued twenty years, not as a general measure, but for the “benefit of such States as shall.mink proper to encourage it.”
.. In tije ease of Groves v. Slaughter, (15 Peters, 449; 14 Curtis, 137,) Messrs. Clay and Webster contended that, under the commercial power, Congress had a right to regulate the slave trade'among the several States;, but the court,held that Con-fress hacj no1 power to interfere with slavery as it exists in the tates, or to regulate1 what is called the- slave- trade among *537 them. If this trade were subject to the commercial power, it would follow that Congress could abolish or establish slavery • in every State of the Union.
The only connection which the Federal Government holds with slaves in a State, arises from that provision of the Constitution which declares that “No person held to service or, labor- in one State, under' the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim oí; .the party to whom such service or labor may be due.” ,
This being a fundamental law of the Federal Government, it rests mainly for its execution, as has been held,' on the judicial- power of the Union; and so far as the rendition of fugitives from labor has become a subject of judicial action, the Federal obligation has been faithfully discharged.
In the formation of the Federal Constitution, care was taken to confer no power on the Federal Government to interfere with this institution in the States. In the provision respecting the slave trade, in fixing the ratio of representation, and providing for the reclamation of fugitives from labor, slaves were referred to as persons, and in no other respect are they considered in the. Constitution.
We need hot refer to the mercenary spirit which introduced the infamous traffic in slaves, to show the degradation of negro slavery in our country. This system was imposed upon our colonial settlements by the mother country, and it is due to truth to say that the commercial colonies and States were chiefly, engaged in the traffic. But we know as a historical fact, that James Madison,.that great and good man, a leading member' in- the Federal Convention, was solicitous to guard the language of that instrument so as not to convey the idea that there could be property in man.
T. prefer the lights of Madison, Hamilton, and Jay, aá a means of construing the Constitution in all its bearings, rather than to. look behind that period, into a traffic which is now declared to be piracy, and'punished with death by Christian nations; I do not like to draw the sources of our domestic relations from só dark a. ground. Our independence was a great eppch in the history of freedom; and while I admit the Government was not made especially for the colored race, yet ’many of them'were citizens of the New England States, and exercised the rights of suffrage when the Constitution-was adopted, arid it was not doubted by any intelligent person that its tefidencies would greatly ameliorate their condition.
. Many of the States, on the adoption of the Constitution, or *538 shortly-afterward, took measures to abolish slavery within their respective jurisdictions; and it is a well-known fact that- a belief was cherished- by the leading men, South as well as North, that the, institution of slavery would gradually decline, until it would become extinct. The increased value of slave labor, in. the culture of cotton and sugar, prevented the realization of this expectation. ■ Like all other communities and States, the South-were' influenced by what they considered to be their own interests.
. But if wé are to turn, our attention to the dark ages óf thé world,, why confine our view to colored slavery ? On the same principles, white men were made slaves. All slavery has its origin, in power, and is against right.
The power of Congress to establish'Territorial Governments, and to prohibit the introduction oh slavery therein, , is the next point to be considered.
After the-cession of western, territory by Virginia and other States, to the United, States, the public attention was directed to the best mode.of disposing of it for the general benefit. ■ While in áttendence on the Federal Convention, Mr. Madison,' in a letter to Edmund Randolph, dated the 22d April, 1-787, .says: “ Congress are deliberating on the plan most eligible for disposing, of the western/ territory not yet surveyed. Some alteration, will.probably be made in the ordinance on that subjecti” And.in the same letter he says: “The inhabitants of the. Illinois complain of the land jobbers, &c., who are pur-¿basing titles among them. Those of, St. Vincent’s complain iff the defe' l ive criminal and civil justice among them, as well as of military protection.”. .And on the next day he writes to Mr. Jefferson:, “The government of the settlements on the Illinois and Wabash is a subject'very perplexing in itself, and rendered .more so by otir ignorance of the many circumstances on which a, right judgment depends. The inhabitants at those .places claim protection against the savages, and some provision for both civil and criminal justice.”
• In Mayj 1787, Mr: Edmund Randolph submitted to the Fed eral Convention certain propositions, as the basis of a Federal Government, among which was the following:
“ Hesolved, That provision ought to be made for the admission of States lawfully arising within the limits of the United States, whether from a voluntary'junction of government and territory or otherwise, with the consent of a number of voices in the Rational Legislature less than the whole.”'
Afterward,' Mr. Madison submitted to the Convention, in order to be referred to the committee of detail, the following-powers, as proper to be added to those of general legislation:
*539 “ To dispose of the unappropriated lands of the United States. To institute temporary Governments for new States arising therein. To regulate affairs with the Indians, as well within as without the limits of the United States.”
Other propositions were made in reference to the same subjects, which it would he tedious to enumerate. Mr. Gouvér-neur Morris proposed the following:
“The Legislature shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution contained shall be so construed as to prejudice any claims either of the United States or of any particular State.” •
This was adopted as a part of the Constitution, with two verbal alterations — Congress was substituted for Legislature, and the word either was stricken out.
In' the organization of the new Government, hut little revenue for a series of years was expected from commerce. The public lands were considered as the principal resource of the country for the payment of the Revolutionary debt. Direct taxation was the means relied on to pay the current expenses of the, Government. The short period that occurred between the cession of western lands to the Federal Government by Virginia and other States, and the adoption of the Constitution, was sufficient to show the necessity of a proper land system and a'temporary Government. This was clearly seen by propositions and remarks in the Federal Convention, some of which are above cited, by the passage of the Ordinance of 1787, and the adoption of that instrument by Congress, under the Constitution, which gave to it validity.
It will he recollected that the deed of cession of western territory was made to the United States by Virginia in 1784, and that it - required the territory ceded to he laid out into. States, that the land should be disposed of for the common benefit of the States, and that all right, title, and claim, as well of soil as of jurisdiction, were ceded; and this was the form of cession from other States.
On the 13th of July, the Ordinance of 1787 was passed, “for the government of the United -States territory northwest of the river Ohio,” with but one dissenting vote. This instru-. mént provided there should be organized in the territory not less than three nor more than five States, designating their boundaries. It was passed while the Federal Convention was in session, about two months before the Constitution was adopted-by the Convention. The members of the Convention must therefore have been well acquainted with the provisions of the *540 Ordinance. It provided for a temporary Government, as initiatory to the formation of State Governments. Slavery was prohibited in the territory. •
Can any one suppose that the eminent men of the Federal Convention could have overlooked or neglected a matter so vitally important to the country, in the organization of temporary Governments for the vast territory northwest of the river Ohio Í In the 3d section of the 4th article of the Constitution, they did make provision for the admission of new States, the sale of the public lands, and the temporary Government of the territory. “Without a temporary Government, new States could not have been formed, nor could the public lands have been sold. •'
' If the third section were before us now for consideration for the first time," under the facts stated, I could not hesitate to say there was adequate legislative power given in' it. The Ítower to make all needful rules and regulations is a power to egislate. This'no one will controvert, as Congress cannot make “rules and regulations;” except by legislation. But it ■is argued tliat the word territory is used as synonymous with the word land; and that the rules and regulations of Congress are limited to the disposition of lands and other property belonging to the United States. That this is not the true construction of the section appears. from the fact that in the-first line of the' section “the power to dispose of the public lands” is given expressly, and, in addition, to make all needful rules and regulations. The power to dispose of is complete in itself, .and requires nothing more. It authorizes Congress to use the proper means within its discretion, and any further provision for this purpose would be a useless verbiage. As a composition, the Constitution is remarkably free from such a charge.
In the discussion of the power of Congress to govern a Territory, in the case of the Atlantic Insurance Company v. Canter, (1 Peters, 511; 7 Curtis, 685,) Chief Justice Marshall, speaking for the court, said, in regard to the people of Florida, “they do not, however, participate in political power; they do not share in the Government till Florida shall become a State; in the mean time, Florida continues to be a Territory of the United States, governed by virtue of that clause in the Constitution which empowers Congress ‘to make alb needful rules and regulations respecting the territory or other property belonging to the United States.’ ”
And he adds; “perhaps the power of governing a Territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result *541 necessarily from tlie fact , that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. The right to govern may he the inevitable consequence of the right to acquire territory; whichever may he the source whence the power is derived, the possession of it is unquestioned.” And in the close of the opinion, the court say, “ in legislating for them [the Territories,] Congress exercises the combined powefs of the General and State Governments.”
Some consider the opinion to he loose and inconclusive; others, that it is obiter dicta; and the last sentence is objected to as recognising absolute power in Congress over Territories. The learned and eloquent Wirt, who, in the argument of a cause before the court, had occasion to cite a few sentences from an opinion of the Chief Justice, observed, “no one can mistake the style, the words so completely match the thought.”
I can see no want of precision in the language of the Chief Justice; his meaning cannot be mistaken. He states, .first, the third section as giving power to- Congress to govern the Territories, and two other grounds from which the power may also be implied. The objection seems to be, that the Chief Justice did not say which of the grounds stated he considered the- source of the power. He did not specifically state this, but he did say, “whichever may be the source whence the powef is derived, the possession of it is unquestioned.”, Ho opinion of the court could have been expressed with a stronger emphasis; the power in Congress is unquestioned. But those who have undertaken to criticise the opinion, consider it without authority, because the Chief Justice did not designate specially the power. This is a singular objection. If the power be unquestioned, it can be a matter of no importance on which ground it is exercised.
The opiilion clearly was not obiter dicta. The turning point in the case was, whether Congress had power to authorize the Territorial Legislature of Florida to pass the law under" which the Territorial court was established, whose decree was brought before this court for revision. The power of Congress, therefore, was the point in issue.
The word “territory,” according to "Worcester, “means land, country, a district of country under a temporary Government.” •The words “territory or other property,” as used, do imply, from the use of the pronoun other, that territory was used as descriptive of land; but does It follow that itwas notusedalso as descriptive' of a district of country ? In both of these senses it.belonged to the United States — as land, for the purpose of sale; as territory, for the purpose of government.
*542 But, if it be admitted that the word territory as used means land, and nothing hut'land, the power of Congress to organize a temporary Government is clear. It has power to make all needful regulations respecting the public lands, and the extent of. those “needful regulations” depends upon the direction of .Congress, where the means are appropriate to the end, and do not conflict with any of the prohibitions of the Constitution. If. a temporary Government be deemed needful, necessary, requisite, or is wanted, Congress has power to' establish it. Tins court says, in McCulloch v. The State of Maryland, (4 Wheat., 316,) “If a certain means to carry into effect any of the powers expressly given by the Constitution to the Govern-. inent of the-Union be an appropriate ineasuie, not prohibited by the Constitution, the degree of its n'eeessity is a question of legislative discretion, not of judicial cognizance.”
The power to establish post offices and post roads gives power to Congress to make contracts for the transportation of the mail, and to punish all who commit depredations upon it in its transit, or. at its places of distribution. Congress has power to regulate commerce, and, in the exercise, of its discretion, to lay an embargo, which suspends commerce; so, under the same power, harbors, lighthouses, breakwaters, &c., are constructed!
Did Chief Justice Marshall, in saying that Congress governed a Territory, by exercising the combined powers of the Federal, and State Governments, refer to unlimited discretion ? ' A Government which can make white men slayes ? Surely, such a remark in the argument must have been inadvertently uttered. On the contrary, there is no power in the Constitution by which ’ Congress can make either white or black men slaves. In organizing the Government of a Territory, Congress is limited to meams appropriate to the attainment of the, constitutional object. bTo powers can'be exercised which are prohibited by the Constitution, or which aré contrary to its spirit; so that, whether the" object may be the protection of the persons and property of purchasers of the public lands, or of communities who have been annexed to the Union by conquest of purchase, they are initiatory to the establishment 6f State Governments, and no more power can be claimed or exercised than is necessary to the attainment of the end. This is the • limitation of all the Federal powers.
But Congress has no power to regulate the internal concerns of a State, as of a Territory; consequently, in providing for the Government of a Territory, to some extent, the combined powers of the Federal and State Governments are necéssarily exercised.
*543 If Congress should deem slaves or free colored persons injurious to the population of a free Territory, as conducing to lessen the vaíué of the public lands, or on any other ground connected with the public interest, they have the power to prohibit them from becoming settlers in it. This can be sustained on the ground of a sound national policy, which is só clearly shown m our history by practical results, thafe it would seem no considerate individual can question it. And, as rep gards any unfairness of such a policy to our Southern brethren, as urged in the argument, it is only necessary to say that!, with one-fourth of the Federal population of the Union, they have in the slave States a larger extent of fertile' territory than is included in the free States; and it is submitted, if masters of slaves be restricted from bringing them into free territory, that the restriction on the free citizens of non-slaveholding States, by bringing slaves into free territory, is four times greater than that complained of by the South. But, not only so; some three or four hundred thousand holders of slaves, by bringing them into free territory, impose a restriction on twenty millions of the ,free States! The . repugnancy to slavery would probably prevent fifty or a hundred freemen from settling in a slave Territoiy, where one slaveholder would be prevented from settling in a free Territory.
This remark is made in answer to the.argument urged, that a prohibition of slavery in the free Territories is inconsistent with the continuance of the Union. Where a Territorial Government is established in a slave Territory, it has uniformly, remained in- that condition until the people form a State Constitution; the same course where the Territory is free, both parties acting in good faith, would be attended with satisfactory results.
The sovereignty of the Federal Government extends to the entire limits of our territory. Should any foreign power invade our jurisdiction, it would be repelled. There is a law of Congress to punish our citizens for crimes committed in districts of country where there is no organized Government. Criminals are brought to certain Territories or States, designated in the lawj for1 punishment. Death has been inflicted in Arkansas and in Missouri, on individuals, for murders committed beyond the limit of any organized Territory or State; and no one doubts that such a jurisdiction was rightfully exercised. If'there be a right to acquire territory, there necessarily must be an implied power to govern it. When the military force of the Union shall conquer a country, may not Congress provide for the government of such country ? This would be an implied power essential to the acquisition of new territory. *544 This power has been exercised, without doubt of its constitutionality, over territory acquired by conquest and purchase.
And wíién there is a large district of country within the United States, and not within any State Government, if it be necessary to establish a temporary Government to carry out a power expressly vested in Congress — as the disposition of the public lands — may not such Government be instituted by Congress? How do we read' the Constitution? Is it not a practical instrument?
In such cases, no implication of a power can arise which is inhibited by the Constitution, or which may be against the theory of its construction. As my opinion -rests on the third section, these remarks are made as an intimation that the power to establish a temporary Government may arise, also, on the other two grounds stated in the opinion of the court in the insurance case, without weakening the third section.
I would here simply remark, that the Constitution was formed for our whole country. An expansion or contraction of our territory required no change in the fundamental law. When we consider the men who laid the foundation of our Government and carried it into operation, the men who occupied the bench, who filled the halls of legislation and the Chief Magistracy, it would seem, if any question could be settled clear of all doubt, it was the power of Congress to establish Territorial Governments. Slavery was prohibited in the entire Northwestern Territory, with the approbation of leading men, South and Horth; but this prohibition was not retained when this ordinance was adopted for the government of Southern Territories, where slavery existed. In a late republication of a letter of Mr. Madison, dated November 27, 1819, speaking of this power of Congress to prohibit slavery, in’a Tez-ritory, he infers there is no such power, from the fact that it has not been exercised. This is not a very satisfactory argument against any power, as there are but few, if any, subjects on which the constitutional powers of Congress are 'exhausted. It is true, as Mr. Madison states, that Congress, in the. act to establish a Government in the Mississippi Territory, prohibited the importation of slaves into it from foreign parts; but it is equally true, that in the act erecting Louisiana into two Terri-, tories, Congress declared, “ it shall not be lawful for any person to bring into Orleans Territory, from any port or place within the limits of the United States, any slave which shall have been imported since 1798, or.which may hereafter be imported, except by a citizen* of the United States who settles in the Territory, under the penalty of the freedoxh of -such- slave.” The inference of Mr. Madison, therefore, against the power of. *545 Congress, is of no force, as it was founded on a fact supposed, which, did not exist.
It is refreshing to turn to the early incidents of our history, ■ and learn wisdom from the acts of the. great men who have gone to their account. I refer' to a report, in the House of Representatives, by Johu Randolph, of Roanoke,, as chairman . of a committee, in March, 1808 — fifty-four years ago. Erom the Convention held at Vincennes, in Indiana, by their President, and from the people of the Territory, a petition was presented to Congress, praying the suspension of the provision which.prohibited slavery in that Territory. The report stated “that the rapid population of the State of Ohio sufficiently evinces, in the opinion of your committee, that the labor of slaves is not necessary to promote the growth and settlement of colonies in that region. That this labor,- demonstrably the dearest of any, can only be employed to advantage in the cultivation of products more valuable than any known to that quarter of the United States; that the committee deem .it highly dangerous and inexpedient to impair a provision wisely' calculated' to promote ■ the happiness and prosperity of the Northwestern country, and to give strength and security to-that extensive frontier. In the salutary operation of this sagacious and benevolent restraint, it is believed that the inhabitants will, at no very distant day, find ample remuneration for ’ atemporary privation of labor and of emigration.” (1 vol. State Papers, Public Lands, 160.)
The judicial mind of this country, State and Federal, has agreed on no subject, within its legitimate action, with equal unanimity, as on the power of Congress to establish Territorial' Governments, Ho court* State or Federal, no judge or statesman, is known to have had. any doubts on this question for nearly sixty years after the power was exercised. Such Governments have been established from the sources of the Ohio to the Gulf of Mexico, extending to the Lakes on the north and the Pacific Ocean on the west, and from the lines of Georgia to Texas.
Great interests h'ave grown up -under the Territorial laws-over a country more than five times greater in extent than thé original thirteen States; and these interests, corporate of' otherwise, have been cherished and consolidated by a benign policy, without any one supposing the law-making power had' united with the Judiciary, under, the universal sanction of the whole country, to usurp a jurisdiction which did not belong to them. ' Such a discovery at this late date is more extraordinary than anything which has occurred in the judicial history of this or any other country. Texas, under a previous organiza* *546 tion, was admitted as a State; but no. State can be admitted into the Union which has not been organized under some form of government. Without temporary Governments, our public lands could not have been sold, nor our wildernesses' reduced to cultivation, and the population protected; nor could our flourishing States, West and South, have been formed.
What do the lessons of wisdom and experience teach, under such circumstances, if the new light, which has so suddenly and unexpectedly burst upon us, be true? Acquiescence; acquiescence under a settled construction of the Constitution for sixty years, though it may be erroneous; which has secured to the country an advancement'and'prosperity beyond the power of computation.
An act of James Madison, when President, forcibly illustrates this policy. He had made up his opinion that Congress had no power under the Constitution to establish a Rational Bank. In 1815, Congress passed a bill to establish a bank. He vetoed the bill, on objections other than constitutional. In his message, he speaks as a wise statesman and Chief Magistrate, as follows:
“Waiving the question of the constitutional authority of the Legislature to establish an incorporated bank, as being precluded, in my judgment, by the repeated recognitions under varied circumstances of the validity of such an institution, in nets of the Legislative, Executive, and Judicial branches of the Government, accompanied by indications, in different modes, •of a concurrence of the general will of the nation.”
Has this impressive lesson of practical wisdom become lost to the present generation ?
If the great and. fundamental principles of our- Government .are never to be settléd, there can be no lasting prosperity. The Constitution will become a floating waif on the billows of popular excitement.
The prohibition of slavery north of thirty-six. degrees thirty minutes, and of the State of Missouri, contained in the act admitting that State into the Union, was passed by a vote of 134, ,in .the House of Representatives, to 42. Before Mr. Monroe signed the act, it was submitted by him to his Cabinet, and they held the restriction of slavery in a Territory to be within "the constitutional powers of Congress. It would be singular, if in 1804 Congress had power to prohibit the introduction of slaves in Orleans Territory from any other part'of the Union, under the penalty of freedom to the slave, if the same power, embodied in the Missouri compromise, could not be exercised in 1820.
But this law of Congress, which prohibits slavery north of *547 Missouri and of thirty-six degrees' thirty minutes, is declared to have been null and void by my brethren. And this opinion is founded mainly, as I understand, on the distinction drawn between the ordinance of 1787 and the Missouri compromise line. In what does the distinction consist? The ordinance, it is said, was a compact entered into by the confederated States before the adoption of the "Constitution; and that in the cession, of territory authority was given to establish a Territorial Government.
It is clear that the ordinance did not go into operation by virtue of the authority of the Confederation, but by reason of its modification and adoption by Congress under the Constitution. It seems to be supposed, in the opinion of the court, that the articles of cession placed it on a different footing from territories subsequently acquired. I am unable to perceive the force of this distinction. That the ordinance was intended for the government of the Northwestern Territory, and was limited to such Territory, is admitted. If was extended to Southern Territories, with modifications, by acts of Congress, -and to-some Northern Territorios.. But the ordinance was made valid by the act. of Congress, and without such act coiild havé been of no force. It rested for its validity on the act of Congress, the same, in my opinion, as the Missouri compromise line.
If Congress may establish a Territorial Government in the exercise of its discretion, it L a clear principle that a court - cannot control that discretion. This being the case, I do-not see on what ground the act is held to be void. „ It did not purport to forfeit property, or take it for public purposes. It only prohibited slavery; in doing which, it followed the .ordinance of 1787. .
I will now consider the fourth head, which is: “ The effect of taking slavés into a State or Territory, ánd so holding them, where slavery is prohibited.”
Tf the principle laid down in the c¿se of Prigg v. The State of Pennsylvania is to be maintained, and. it is certainly to ‘ be maintained until overruled, as the law of this court, there can be no difficulty on this point. In that case, the court says: “ The state of slavery is deemed to bé a mere municipal regulation, founded upon and limited to the range of the territorial laws.” If this be so, slavery can exist nowhere except under the authority of law* founded on usage having the force of law, or by statutory recognition. And the court farther sáys: “It is manifest, from tins consideration, that if the Constitution had not contained the clause requiring the rendition of fugitives from labor, every non-slaveholding State in the Union would, have been at liberty to have declared free all runaway slaves *548 coming within its limits, and to have given them entire immunity and protection against the claims of their masters.”
Row, if a slave abscond, he may be reclaimed; but if he accompany his master into a State or Territory where slavery is prohibited, such slave cannot be said to have left the service of his master where his services were legalized. And if slavery be' limited to the range of the territorial laws, how can the slave be coerced ■ to. serve in a State or Territory, not only without the.authority of law, but against its express provisions ? What gives the master the right to control the will of his slave ? The local law, which exists in some form. But where there is no such law, can the master control the will of the slave-by force ? Where- no slavery exists, the presumption, without .regard to color, is in favor of freedom. Under such a jurisdiction, may the colored- man be levied on.as the property of his master by a creditor? On the decease of the master, does the slave descend to his heirs - as property ? Can the master sell him ? Any one or all of these acts may be done to the slave, where he is legally held to service. But where the law does not confer this power, it cannot be exercised.
Lord Mansfield’held, that a slave brought into England was free. Lord Stowell agreed with Lord Mansfield in this respect, and that the slave could not be coerced in England; but on, her voluntary return to Antigua, the place of her slave domicil, her former status attached. The law of England did not prohibit .slavery, but did not authorize it. The jurisdiction which prohibits slavery is much stronger in behalf of the slave within it,’ .than where it only doe_s ñbt authorize it.
By virtue of what law is it, that a master may take his slave into free territqry, and exact from him the duties of a slave?. The law .of the Territory does not sanction, it. Ro authority can be claimed under the Constitution -of the United States, or any law of Congress. Will it be said that the slave is taken as property, the same as other property which the master may own ? To this I answer,. that colored persons are made property by the law of the State, and no such power has been given to Congress. Does the master carry with him the law of the State from which; he removes into the Territory? and does that enable him to .coerce his slave in the Territory? Let us test this.,theory.- If this may be done by a-master from one slave State, it may be 'done by a master from every other slave State. This right is supposed to be connected with the person of the. master, by virtue of the local law. Is it transfer-: able ? May it be negotiated, as a promissory note or bill of exchange? If it be assigned tó á man from a free State, may be coerce the slave by virtue of it? What shall'this thing be *549 denominated? Is it personal ór real property? Or is'it an indefinable fragment of sovereignty, which every person carries with him from his late domicil ? One thing is certain, that its origin has been very recent, and it is unknown to thé laws of any civilized country.
A slave’is brought to England from one of its islands, where slavery was introduced and maintained by the mother country. Although there is no law prohibiting slavery in England, yet there is no law authorizing it; and, for near a century, its courts have declared that the slave there is free from the coercion of the master. Lords Mansfield and Stowell agree upon this point, and there is no dissenting authority.
There is no other description of property, which was not protected in England, brought from one of its slave islands. Does not this show that property in a human being does not arise from nature or from the common law, but, in the language of this court, “ it is a mere municipal regulation, founded upon and limited to' the range of the territorial laws ? ’ ’ This decision is not a mere argument, but it is the end of the law, in regard' to the extent of slavery. Until it shall be overturned, it is not a point for argument; it is obligatory on myself and my brethren, and on all judicial tribunals over which this court exercises an appellate power.
It is said the Territories are common property of the' States-, and that every man has a right to go there with his property. This is not controverted. But the court say a slave is not' property beyond the operation of the local law which makes him such. Heverwas a truth more authoritatively and justly uttered by man. Suppose a master of a slave in a British island owned a million of property in England; would that authorize him to take his slaves with him to England? The Constitution, iu express terms, recognises the status of slavery as founded on the municipal law: “Ho person held to. service or labor in one State, under the laxos thereof, escaping into another, shall,” &c. How, unless the fugitive escape from a place where, by the municipal law, he is held to labor, this provision affords no remedy to the master. "What can be more conclusive than this ? Suppose a slave escape from a Territory where slavery is not authorized by law, can he be reclaimed?
■In this ease, a majority of the court have said that a slave may be taken by his master into a Territory of the United States, the same as a horse, or any other kind of property. It is true, this was said by the court, as also many other things, which are' of no authority. Hothing that has been said by them, which has not a direct bearing on the jurisdiction of the court, against which they decided, can be considered as *550 authority. I shall certainly not regard it as such. The question of jurisdiction, being before the court, was decided by them authoritatively, but nothing beyond that question. A slave is not a mere chattel. He bears the impress of his Maker, and is amenable to. the laws of G-od and man; and he is destined to an endless existence.
Under this head I shall chiefly rely on the decisions of the Supreme Courts of the Southern States, and especially of the State of Missouri.
In the first and second sections of the sixth article of the Constitution of Illinois, it is declared that' neither slavery nor involuntary servitude shall hereafter be introduced into this State, otherwise than for the' punishment of crimes whereof the party shall have been duly convicted; and in the second section it is declared that any violation of this article shall effect the emancipation of such person from his obligation to service. In Illinois, a right of transit through the State is given the master with his slaves. This is a matter which, as I suppose, belongs exclusively to the State.
The Supreme Court of Illinois, in the case of Jarrot v. Jarrot, (2 Gilmer, 7,) said:
“After the conquest of this Territory by Virginia, she ceded it to the United States, and stipulated that the titles and possessions, rights and liberties, of the French settlers, should be guarantied to them. This, it has been contended, secured them in the possession of those negroes as slaves which they held before that time, and that neither Congress nor the Convention had power to deprive them of it; or, in other words, that the ordinance and Constitution should not be so interpreted and understood as applying to such slaves, when it is therein declared that there shall be neither slavery nor involuntary servitude in the Northwest Territory, nor in the State of Illinois, otherwise than in the punishment of crimes. But it was held that those rights could not be thus protected, but must yield to the ordinance and Constitution.”
The first slave case • decided by the Supreme Court of Missouri, contained in the reports, was Winny v. Whitesides, (1 Missouri Rep., 473,) at October term, 1824. It appeared that, more ■ than twenty-five years before, the defendant, with her husband, had removed from Carolina to Illinois, and brought with them the plaintiff; that they continued to reside in Illinois three or four years, retaining the plaintiff as a slave; after which, they removed to Missouri, taking her with them.
The court held, that if a slave be detained in Illinois until he be entitled to freedom, the right of the owner does not re-' vive when he finds the negro in a slave State.
*551 ■ That when a slave is taken to Illinois by his owner, who takes np his residence there, the slave is entitled to freedom.
In the case of Lagrange v. Chouteau, (2 Missouri Rep., 20, at May term, 1828,) it was decided that the ordinance of 1787 was intended as a fundamental law for those who may choose to live under it, rather than as a penal statute.
That any sort of residence contrived or permitted by the legal owner of the slave, upon the faith of secret trusts or contracts, in order to defeat or evade the ordinance, and thereby introduce slavery defacto, would entitle such slave to freedom.
In Julia v. McKinney, (8 Missouri Rep., 279,) it was held, where a slave was settled in the State of Illinois, but with an intention on the part of the Owner to be removed at some future day, that hiring said slave' to a person to labor for one or two days, and receiving the pay for the hire,.the slave is entitled to her freedom, under, the second section'of the sixth article of the Constitution of Illinois.
Rachel v. Walker (4 Missouri Rep., 350, June term, 1836) is a ease involving, in'every particular, the principles of the' ease before us. Rachel sued for her freedom ;• and it appeared that she had been bought as a slave in Missouri, by Stockton, an officer of the army, taken to Fort.Suelling, where he was. stationed, and she was retained there as-a slave a year;- and then Stockton removed' to Prairie du Chjen, .taking Rachel with him as a slave, where he continued to hold her - three • years, and then he took her to the State of Missouri, and sold her as a slave.
“Fort Snelling was admitted to be on the west side of the Mississippi river, and north of the State of Missouri, in-the territory of the United States. That Prairie du Chien was'in the Michigan Territory, on the east side of the Mississippi river. Walker, the defendant, held Rachel under Stockton.”
The court said, in this cáse:
“The officer lived in Missouri Territory, at the time he bought the slave; he sent to a slaveholding country and procured her; this was his voluntary act, done without any other reason than that of his convenience; and he and those- claiming under him must be holden to abide the consequences of introducing slavery both in Missouri Territory and Michigan, contrary to law; and, on that ground Rachel was declared to be entitled to freedom.”
In answer to the argument that, as an officer of the army, the master had a right to ta*re his slave into free territory, the court said no authority of law or the Government compelled him to keep the plaintiff there as a slave.
“Shall it be said, that because an officer of the army owns *552 slaves in' Virginia, that ivhen, as officer and soldier, lie is required to take the command of a fort in the nón-slaveholding States or Territories, he thereby has a right to take with him as many slaves as will suit his interests .or convenience ? It surely cannot be law. If this be true, the court say, then it is also true that the convenience or supposed convenience of the officer repeals; as to him and ■ others who have the same character, the ordinance and the act of 1821, admitting Missouri into the Union, and also the prohibition of the several'laws and Constitutions of the non-slaveholding States.” ■
In Wilson v. Melvin, (4 Missouri R., 592,) it appeared the defendant left Tennessee with an intention of residing in Illinois, taking his negroes with him'. After a month’s stay in Illinois, he took his negroes to St.'Louis, and hired them, then returned to Illinois. On these facts, the inferior court instructed the jury that the defendant was- a sojourner in Illinois. This the Supreme Court held was error, and the judgment was reversed.
The case of Dred Scott v. Emerson (15 Missouri R., 682, March term, 1852) will now be stated. This case involved the identical question before us, Emerson having, since the hear-, ing, sold the plaintiff to Sandford, the defendant.
Two of the judges ruled the case, the Chief Justice dissenting. It cannot be improper tq state the grounds of the opinion of the court, and of the dissent.
The court say: “Cases of this kind are not strangers in our court. Persons have been frequently here adjudged to be entitled to their freedom, on the ground that their masters held them in slavery in Territories or States in which that institution is prohibited. Prom the first case decided in our court, it might be inferred that this result was brought , about by a presumed assent of the master, from the fact of having voluntarily taken his slave to a place where the relation of. master and slave did not exist. But subsequent cases base the right to ‘exact the forfeiture .of emancipation,’ as they term it, on the ground, it would seem, that it was the duty of the courts of this State to carry into effect the Constitution and laws of other States and Territories, regardless of /the rights, the policy, or the institutions, of the people of this State.”
And the court say that the States of the Union, in their' municipal concern's, are regarded as foreign to. each other; that the courts of one State do not take notice of the' laws of other States, unless proved as facts, and that every State-has the right to determine, how far its comity to other States shall extend; and it is laid down, that when there is no act of manumission decreed to the free State, the courts of the slave States *553 cannot be called to ' give effect to the law of the free State. Comity, it alleges, between States, depends npon the discretion of both, which may be varied by circumstances. And it is declared by the court, “that times are. not.as they were when the former decisions on this subject were mad¿.” Since then, not only individuals but States have been possessed with. a dark and fell spirit in relation to slavery, whose gratification is sought in the pursuit of measures whose inevitable consequence must be the overthrow and destruction of our Government. Under such- circumstances, it does not' behoove the State of Missouri to show the least countenance to any measure which might gratify 'this spirit. She is willing to assume her full responsibility for the existence of slavery within her limits, nor does she seek to share or divide it with others.
Chief Justice Gamble dissented from the other two judges. He says:
. “In every slaveholding State in the Union, the subject of emancipation is regulated by statute; and the forms are prescribed in which it shall be effected. Whenever the forms required by the laws of the State in which the master and slave are resident are complied with, the emancipation is complete, and the slave is free. If the right of the person thus emancipated is subsequently drawn in question in another State, it will be ascertained and determined by the law of the State in which the slave and his former master resided; and when it appears that such law has been complied with, the right to freedom will be fully sustained in the courts of all the slave-holding States, although. the act of emancipation may not be in the form required by law in which the court sits.’
“In all such cases, courts continually administer the law of the country where the right was acquired; and when that law becomes known to the court, it is just as much a matter of course to decide the rights of the parties according to its re-, quirements, as it is to settle the title of real estate situated in . our State by its ■ own laws.”
This appears to me a most satisfactory answer to the argument of tibie court/. Chief Justice continues:
. “ The perfect equality of the different States lies at the foundation of the Union. As the institution, of slavery in the States is one over which the Constitution of the United States gives no power to the- General Government, it is left to be adopted or rejected by the several States, as they think best; nor can any one State, or number of States, claim the right to intejv fere with any other State upon the question of admitting or excluding this institution.
“A citizen óf Missouri, who removes with his slave.to Uli» *554 nois, has no right to complain that the fundamental law of that State to which he removes, and in which he makes his residence, dissolves the relation between him and his slave. It is as much his own voluntary act, as if he had executed a deed of emancipation. Ho one can pretend ignorance of this constitutional provision, and,” he says, “ the decisions which have heretofore been made in this State, and in many other slaveholding States, give effect to this and other similar provisions, on the ground that the master, by making the free State the residence of his slave, has submitted his right to the operation of the law of such State; and this,” he says, “is the same in law as a regular deed of emancipation.”
He adds:
“I regard the question as conclusively settled by repeated adjudications of this court, and, if I doubted or denied the propriety of those decisions, I would not feel myself any more at liberty to overturn them, than I would any other series of decisions by which the law of any other question was settled. There is with me,” he says, “nothing in the law relating to slavery which distinguishes it from the law on any other subject, or allows any more accommodation to the temporary public excitements which are gathered around it.”
“In this State,” he says, “ it has been recognised from the beginning of the Government as a correct position in law, that a master who takes his slave to reside in a State or Territory where slavery' is prohibited, thereby emancipates his slave.” These decisions, which come down to the year 1837, seemed to have so fully settled the question, that since that time there has been no case bringing it before the court for any reconsideration, until the present. In the case of Winny v. Whitesides, the question was made in the argument, “whether one nation would execute the penal laws of another,” and the court replied in this language, (Huberus, quoted in 4 Dallas,) which says, “personal rights or disabilities obtained or communicated by the laws of any particular place are of a nature which accompany the person wherever he goes;” and the Chief Justice observed, in the case of Rachel v. Walker, the act of Congress called the Missouri compromise wras held as operative as the ordinance of 1787.
When Dred Scott, his wife and children, were removed from Eort Snelling to Missouri, in 1838, they were free, as the law was then settled, and continued for fourteen years afterwards, up to 1852, when the above decision was made. Prior to this, for nearly thirty years, as Chief Justice Gamble declares, tlj.e residence of a master with his slave -in the State of Illinois, or in the Territory north of Missouri,, where slavery was prohibited *555 by the act called the Missouri compromise, would manumit the slave as effectually as if be had executed a deed of emancipation; and -that an officer of the army who takes his slave into that State or Territory, and holds him there as a slave, liberates him the same as any other citizen — and down to the above time it was settled by numerous and uniform decisions; and that on the return of the slave to Missouri, his former condition of slavery did not attach. Such was the settled law of Missouri until the decision of Scott and Emerson.
In the case of Sylvia v. Kirby, (17 Misso. Rep., 434,) the court followed the above decision, observing it was similar in all respects to the case of Scott and Emerson.
This court follows the established construction of the statutes of a State by its Supreme Court. Such a construction is considered as a part of the statute, and we follow it to avoid two rules of property in the same State. But we do not follow the decisions of the Supreme Court off a State beyond a statutory construction as a rule- of decision for this court. State decisions are always viewed with respect and treated as authority; but we follow the settled construction of the statutes, not because it is of binding authority, but iu pursuance of a rule of judicial policy.
But there is no pretence that the case of Dred Scott v. Emerson turned upon the construction of a Missouri statute; nor was there any established rule of property which coRld have rightfully influenced the decision. On the contrary, the decision overruled the settled law for near thirty years. .
This is said by my brethren to be- a Missouri question; but there is nothing which gives it this character, except that it involves the right to persons claimed as slaves who reside in Missouri, and the decision was made by the Supreme Court of that State. .It involves a right claimed under an act of Congress and the Constitution of Illinois, and whieh cannot be decided without the consideration and construction of those laws. But the Supreme Court of Missouri held, in this case, that it will not regard either of those laws, without which there was no case before it; and Dred Scott, having been a slave, remains a slave. In this respect it is admitted this is a Missouri question — a case whieh has but one side, if the act of Congress and the Constitution of Illinois are not recognised.
And does such a ease constitute a rule of decision for this court — a case to be followed by this court? The course of decision so long and so uniformly maintained established a comity or law.between'Missouri and the free States and Territories where slavery was prohibited, which must be somewhat regarded in this case. Rights sanctioned for twenty-eight years *556 ought not and cannot be repudiated, with any semblance of justice, by one or two decisions, influenced, as declared, by a. determination to counteract tbe excitement against slavery in tbe free States.
•Tbe courts of Louisiana having held, for a series of years, that where a master took bis slave to France, or any free State, be was'entitled to freedom, and that on bringing him back tbe status of slavery did not attach, tbe Legislature of Louisiana declared by an act that the slave should not be made free under such circumstances. This regulated tbe rights of tbe master from tbe time tbe act took effect. But tbe decision of tbe Missouri court, reversing a former decision, affects all previous decisions, technically, made on tbe same principles, unless such decisions are protected by tbe lapse of time or the statute of limitations. Dred Scott and bis family, beyond all controversy, were free under tbe decisions made for twenty-eight years, before-tbe case of Scott v. Emerson. This was tbe undoubted law of Missouri for fourteen years after Scott and bis family were brought back to that State. And the grave question arises, whether this law may be so disregarded as to enslave free persons. I am strongly inclined to think that a rule of decision so well settled as not to be questioned, cannot be annulled by a single decision of tbe court. Such rights may be inoperative under tbe decision in future; but I cannot well perceive bow it can have the same effect in prior cases.
It is admitted, that when a former' decision is reversed, tbe technical effect of the judgment is to make all previous adjudications on tbe same question erroneous. But tbe case before us was not that tbe law bad been erroneously construed, but that, under tbe circumstances which then existed, that law would not be recognised; and tbe reason for this is declared to be tbe excitement against tbe institution of slavery in tbe free States. . While I lament this excitement as much as any one, I cannot assent that it shall be made a basis of judicial action.
In 1816, tbe common law, by statute, was made a part of. tbe law of Missouri; and that includes the gi’eat principles of international law. These principles cannot be abrogated by judicial decisions. ' It will require tbe same exercise *oi power' to abolish tbe common law, as to introduce it. International law is founded in the opinions generally received and acted on by civilized nations, and enforced by moral sanctions. It becomes a more authoritative system when it results from special compacts,-founded on modified rules, adapted to the exigencies of human society; it is in fact an international morality, adapted to the best interests of nations. And in regard to the States *557 of this Union, on the subject of slavery, it is eminently fitted for a rule of action, subject to tbe Federal-Constitution. “The laws of nations are but the natural rights of man applied to nations.” (Yattel.) '
If the common law have the force of a statutory enactment in Missouri, it is clear, as it seems to me, that a slave who, by a residence in Illinois in the service, of his master, becomes entitled to his freedom, cannot again be reduced to slavery by returning to his former domicil in a slave State. It is unnecessary to say what legislative power might do ,by a general act in such a ease, but it would be singular if a freeman could be made a slave by the exercise of a judicial discretion. And it would be still more extraordinary if this could be done, not only in the absence of special legislation, but in a State where the common law is in force.
• It is, supposed by some, that the third article in the treaty of cession of Louisiana to this country, by Franco, in 1808, may have some bearing on this question. The article referred to provides, “that the inhabitants of the ceded territory shall be incorporated into the .Union, and enjoy all the advantages of citizens of the,United States, and in the mean1 time they shall be maintained and protected in the free enjoyment of their liberty, property, and the religion they profess.”
As slavery existed in Louisiana at the time of the cession, it is supposed this is a guaranty that there should be no change in its condition.
The answer .to this is, in the first place, that such a subject does not belong to the treaty-making power; and any such arrangement would have been nugatory. And, in the second place, by no admissible construction can the' ‘ guaranty be carried further than the protection of property in slaves at that time in the ceded territory. And this Las been complied with. The organization of the slave States of Louisiana, Missouri, and Arkansas, embraced every slave in Louisiana at the time of the cession. This removes every ground of objection under the treaty. There is therefore no pretence, growing out of the treaty, that any, part of the territory of Louisiana, as ceded, beyond the organized States, is slave territory.
Under the fifth head, we.were to consider whether the status of slavery attached to the plaintiff and wife, on their return to Missouri.
This doctrine is not asserted in the late opinion of the Supreme Court of Missouri, and up to 1852 the contrary doctrine was' uniformly maintained by that court.
In its late decision, the court say that it will not give effect in Missouri to the laws of Illinois, or the law of Congress *558 called the Missouri compromise. This was the effect of the decision, though its terms were, that the court would not take notice, judicially, of those laws.
In 1851, the Court of Appeals of South Carolina recognised the principle, that a slave, being taken to a free State, became free. (Commonwealth v. Pleasants, 10 Leigh Rep., 697.) In Betty v. Horton, the Court of Appeals held that the freedom of the slave was acquired by the action of the laws of Massachusetts, by the said slave being taken there. (5 Leigh Rep., 615.)
The slave States have generally adopted the rule, that where the master, by a residence with his slave in a State or Territory where slavery is prohibited, the slave was entitled to his freedom everywhere. This 'was the settled doctrine of the Supreme Court of Missouri. It has been so held in Mississippi, in Virginia, in Louisiana, formerly in Kentucky, Maryland, and in other States.
The law, where a contract is made and is to be executed, governs it. This does not depend upon comity, but upon the law of the contract. And if, in the language of the Supreme Court of Missouri, the master, by taking his’slave to .Illinois, and employing him there as a slave, emancipates him as effectually as by a deed of emancipation, is it possible that such an act is not matter for adjudication in any slave State where the master may take him ? Does not the master assent to the law, when he places himself under it in a free State ?
' The States of Missouri and Illinois are bounded by a common line. The ope prohibits slavery, the other admits it. This has been done by the exercise of that sovereign power which appertains to each. We are bound to respect the institutions of each, as emanating from the voluntary action of the people. Have the people of either any right to disturb the relations of the other ? Each State rests upon the basis of its own sovereignty, protected by the Constitution. Our Union has been the foundation of our prosperity and national glory. Shall we not cherish and maintain it ? This -can only be doné by respecting the legal rights of each State.
If a citizen of a free State shall entice or. enable a slave to escape' from the service of his master, the law holds him responsible, not only for the loss of the' slave, but he is liable to be indicted and fiped for the misdemeanor. And I am bound here to say, that I have never found a jury in the four States which constitute my circuit, which have not sustained this law, where the evidence required them to sustain it. And it is proper that I should also say, that more cases have arisen in my circuit, by reason, of its extent and locality, than in all *559 other parts of the Union. This has been done to vindicate the sovereign rights of the Southern States, and protect the legal interests of our brethren of the South.
Let these facts be contrasted with the case now before the court. Illinois has declared in the most solemn and impressive form that there shall be neither slavery nor involuntary servitude in that State, and that any slave brought into it, with a view of becoming a resident, shall be emancipated. And effect has been given to this provision of the Constitution by the decision of the Supreme Court of that State. "With a full knowledge of these facts, a slave is brought from Missouri to Rock Island, in the State of Illinois, and is retained there as a slave for two years, and then taken to Fort Snelling, where slavery is prohibited by the Missouri compromise act, and there he is detained two years longer in a state of slavery. Harriet, his wife, was also kept at the same place four years as a slave, having been purchased in Missouri. They were then removed to the State of- Missouri, and sold as slaves, and in the action before us they are not only claimed as slaves, but a majority of my brethren have held that on their being returned to Missouri the status of slavery attached to them.
I am not able to reconcile this result with the respect due to the State of Illinois. Having the same rights of sovereignty Us the State of Missouri in adopting a Constitution, I can perceive no reason why the institutions of Illinois should not receive the same consideration as those of Missouri. Allowing to my brethren the same right of judgment that I exercise myself I must be permitted to say that it seems to me the principle laid down will enable the people of a slave State to introduce slavery into a free State, for a longer or shorter time, as may suit their convenience; and by returning the slave to the State whence he was brought, by force or otherwise, the status • of slavery attaches, and protects the rights of the-master, and defies the sovereignty of the free State. There is no evidence before us that Dred Scott and his family returned to Missouri voluntarily. The contrary is inferable from the agreed, case: “In the year 1838, Dr. Emerson removed- the plaintiff and said Harriet, and their daughter Eliza, from Fort Snelling to the State of Missouri, where they have ever since resided.” This is the agreed case; and can it be inferred from this that Scott and family returned to Missouri voluntarily? He was removed; which shows that he was passive, as a slave, having exercised i. o volition on the subject. He did not resist the master by absconding or force. But that was not sufficient .to bring him within Lord Stowell’s decision; he must have, acted voluntarily. It would be a *560 mockery of law and an outrage on his rights to coerce his return, and then claim' that it was voluntary, and on that ground that his former status of slavery attached.
If the decision he placed on this ground, it is a.fact for a jury to decide, whether the return was voluntary, or,else the fact should be distinctly admitted. A presumption against the plaintiff in- this respect, I say. with confidence, is not authorized from the facts admitted.
In coming to the conclusion that a voluntary return by Grace to her former domicil, slavery attached, Lord Stowell took great pains to show that England forced slavery upon her colonies, and that it was maintained by numerous acts of Parliament and public policy, and, in short, that the system of slavery was not only established by Great Britain in her West Indian colonies, but that it was popular and profitable to many of the wealthy and influential people of England, who were engaged in trade, or owned and cultivated plantations in the colonies. Ho one can read his elaborate views, and not be struck with the great difference between England .and her colonies, and the free and slave States of this Union. While slavery in the colonies of England is. subject to the ■power of the mother country, our States, especially in regard to slavery, are independent, resting upon their own sovereign-ties, and subject only to international laws, which apply to independent States.
In the case of Williams, who was a slave In Granada, having run away, came to England, Lord’Stowell said: “The four judges all concur in-this — that hé was. a, slave in Granada, though a free man in England, and he would have continued a free man in all other parts of the world except Granada.”
Strader v. Graham (10 Howard, 82, and 18 Curtis, 305) has been cited. as having a direct bearing in the case before us. In that Case the. court say : “It was exclusively in the power of Kentucky, to determine, for itself, whether the employment of slaves in another State should or should, not make them free on their return.” Ho question was before the court in that case, except that of jurisdiction. And any opinion given on any other point is obiter dictum, and qf no authority. ' In.the conclusion of his opinion, the Chief Justice said: “In every view of the subject, therefore, this, court has no jurisdiction of the case, and the writ of error, must on that ground be dismissed.” • ■. -
' In the case of Spencer v. Negro Dennis, (8 Gill’s Rep., 321,) the court say ': “ Once free, and always free, is the maxim of Maryland law upon the subject. Freedom having'once vested, by no compact between the master and the the liberated slave, *561 nor by any condition subsequent, attached by tbe master to. the gift of freedom, can a state of slavery ,be reproduced.” .
In Hunter v. Bulcher, (1 Leigh, 172:)
“By a statute of Maryland of 1796, all slaves brought into that State to reside are declared free; a Yirginian-born slave is carried by Lis master to Maryland; the master settled there, and keeps the slave there in bondage for twelve years, the statute in force all the time; then he brings him as a slave to Virginia, and sells him there. Adjudged, in an.action brought by the man against the purchaser,' that he is free.”
Judge Kerr, in the case, says:
“Agreeing, as I do, with the general view taken in this case by my brother Green, I would not add a word, but to mark, the exact extent to which I mean to go. The- law of Maryland having enacted that slaves carried into that State for sale or to reside shall be free, and the owner of the ¿slave here having, carried him-to Maryland, and voluntarily submitting himself and the slave-to that law, it governs the case.”
Tn every decision of a slave case prior to that of Dred Scott v. Emerson, the Supreme Court of Missouri considered it as turning upon the Constitution of Illinois, the ordinance of 1787, or tlie Missouri compromise act.of 1820. The court treated these acts as in force, and held itself bound to execute them, by declaring the slave to be free who had acquired a domicil under them with the consent of his master.
The late decision reversed this whole line of adjudication, and held that neither the. Constitution and laws of the States, nor acts of Congress in relation to Territories, could be judicially . noticed by the Supreme Court of Missouri. This is believed to be in conflict with the decisions of all the courts in the Southern States, with some exceptions of recent cases.
In Marie Louise v. Morat et al., (9 Louisiana Rep., 475,) it was held, where a slave having been taken to the kingdom of France - or. other country by the owner, where slavery is not tolerated, operates on the condition of the slave; -and produces immediate emancipation; and that, where a slave thus becomes free,-the master cannot reduce'him again to slavery.-,
Josephine v. Poultney, (Louisiana Annual Rep., 329,) “where' the owner removes with a slave into a State in whieh slavery is prohibited, with the intention of residing there? the slave will be thereby emancipated, and their subsequent return to the State of Louisiana cannot restore the'relation of master and slave.;” To the same import are the cases of Smith v. Smith, (13 Louisiana Rep., 441; Thomas v. Generis, Louisiana Rep., 483; Harry et al. v. Decker and Hopkins, Walker’s Mississippi Rep., 36.) It was held that-,- “ slaves within the ju- *562 risdiction of the Northwestern Territory became freemen by virtue of the ordinance of 1787, and can. assert their claim to freedom in the courts, of Mississippi.” (Griffith v. Fanny, 1 Virginia Rep., 143.) It was decided that,a negro held in servitude in Ohio, under a deed executed in Virginia, is entitled to freedom by the Constitution of Ohio.
The case of Rhodes v. Bell (2 Howard, 307; 15 Curtis, 152) involved, the main principle in the case before us. A person residing pi Washington city purchased n slave in Alexandria, and brought him to Washington. Washington continued under the law of Maryland, Alexandria under the law of Yif-Í" inia. The act of Maryland of November, 1796, (2 Maxcy’s Laws, 351,) declared any one who shall bring any negro, mulatto, of other slave, into Maryland, such slavé should be free-. The above slave, by reason of his being brought into Washington ci,ty, was declared by this court to be free. This, , it appears to me, is a much stronger case against the slave than the facts in the case, of Scott..
In Bush v. White, (3 Monroe, 104,) the court say:
“ That the ordinance was paramount to the Territorial laws, and restrained the legislative power there as effectually as a Constitution in an organized State. It was 'a public act of the Legislature of the Union, and a part of the supreme law of the land; and, as such, this court is as much bound to take notice of it as it can be of any other law.”
lit the case of Rankin v. Lydia, before cited, Judge Mills, speaking for the Court of Appeals of Kentucky, says:
. “If, by the positive provision in our code, we can and must hold our slaves in the one case, and statutory provisions equally .positive'decide against that right in the other, and liberate the slave, he must,~ by an authority equally imperious, be declared free. ■ Every argument which supports the right of the master on -one side, "based upon the force of written law, must be equally conclusive in favor of the slave, when he can point out in the -statute -the clause which secures his freedom.”
And he. further said:
“Eree people of color in all the States are, it is believed,' quasi citizens, dr, at least, denizens. Although none of. the States may allow them the privilege of office and suffrage, yet all other civil and conventional rights .are secured to them; at least, such rights were evidently secured to them by the ordinance in question for the government of Indiana. If these rights are vested in that or any other portion of the United States, can it be compatible with the spirit of our ,^'onfederated ■Government to deny their existence in any other part? Is there less .comity existing between State and State; or State *563 and Territory, than exists between the despotic Governments of Europe?”
These are the words of a learned and great judge, horn and educated in a slave State.
I now come to inquire, under the sixth and last head, “whether the decisions of the Supreme Court of Missouri, on the question before us, are binding on this court.”
"While we respect the learning and high intelligence of the State courts, and consider their decisions, with others, as authority, we follow them only where they give a construction to the. State statutes. On this head, I consider myself fortunate in being able to turn to the decision of this court, given by Mr. Justice. Grier, in Pease v. Peck, a case from the State of Michigan, (18 Howard, 589,) decided in December term, 1855. Speaking for the court, Judge Grier said:
“We entertain the'highest respect for that learned court, {the Supreme Court of Michigan,) and in any question affecting the construction of their own laws, where we entertain any doubt, would be glad to be relieved from doubt and responsibility by reposing on their decision., There are,, it is true, many dicta to be found in our decisions, averring that the courts of the United States are bound to follow the decisions of the State courts on the construction of their own laws. But. although this may be correct, yet a rather strong expression vof a general rule, it cannot be .received as the annunciation of á maxim of universal application; Accordingly, our reports furnish many cases of exceptions to it. In all cases where there is a settled construction of the laws of a State,'by its highest judicature established by admitted precedent, it is the practice of the courts of the United States to receive and adopt it, without criticism or further inquiry. When the decisions of the State court are not consistent, we do not feel bound to follow the last, if it is contrary to our own convictions; and much more is this the case where, after a long course'of consistent decisions, some new light suddenly springs up, or an excited public opinion has elicited new doctrines subversive of former safe precedent.”
These words, it appears to me, have a stronger application to the case before us than they had to the cause in which they were spoken as the opinion of this court;'and I regret that they do not seem to be as fresh in the recollection Of some of my brethren as in my own. For twenty-eight years, the decisions of; the Supreme Court of Missouri were consistent on all the points made in this case. But this consistent course was suddenly terminated, whether by some new light suddenly springing up, or an excited public opinion, or both, it is not *564 necessary fo say. In the ease of Scott v. Emerson, in 1852, they were overturned and repudiated.
This, then,.is the very case in which seven-of my brethren declared they would not follow the last decision. On this authority I may well repose. I can desire no other or better basis.
But there is another ground which I deem conclusive, and which I will re-state. - .
The Supreme Court of Missouri refused to notice- the act of Congress or the Constitution of Illinois, under which Dred. Scott, his wife and children, claimed that they are entitled to freedom. ■ ' . .
This being rejected by the Missouri court, there was no case before it, or least it was a case with only one side. And this is the case which, in the opinion of this court, we are bound to follow. ‘The Missouri court disregards, the express provisions of an act of. Congress and the Constitution of a sovereign State, both of which laws for twenty-eight years it had not only regarded, but carried into effect.
If a State court may do this, on a question involving the liberty of a human being, what protection do the laws afford ? So far from this being a Missouri question, it is a.question, as it would seem, within the twenty-fifth section of the judiciary act, where a right to freedom being set up undér the act of Congress, and the decision being against such right, it may be brought for revision before this court,, from the Supreme Court of Missouri.
I think the judgment of the court below should be reyersed.